**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| NORTH AMERICAN STEEL CONNECTION, INC. <br><br>           Plaintiff, <br><br><br> v. <br><br><br> WATSON METAL PRODUCTS CORP. and GARY OSTERMUELLER <br><br>           Defendants. | Civ. No. 08-4247 (DRD) <br><br><br> **O P I N I O N** |

*Appearances by:*

LAW OFFICERS OF HOWARD B. FLECHER
by: Howard B. Flecher, Esq.
347 Fifth Avenue, Suite 900
New York, NY 10016

      *Attorneys for Plaintiff,*

PORZIO BROMBERG & NEWMAN, P.C.
by: Peter J. Gallagher, Esq.
Michael L. Rich
100 Southgate Parkway
P.O. Box 1997
Morristown, NJ 07962

      *Attorneys for Defendants.*

**DEBEVOISE, Senior District Judge**

        The plaintiff, North American Steel Connection, Inc. ("NASCO") and the corporate

defendant, Watson Metal Products, Corp. ("Watson"), began a joint venture in 2007.  The parties

agreed in February 2008 that Watson owed NASCO some quantity of money due to accounting

issues; the parties drew up a payment plan but that did not suffice to resolve the issues between the parties.  On August 22, 2008, NASCO filed suit in this Court against Watson and its former President and majority owner, Gary Ostermueller, asserting claims for breach of contract, breach of fiduciary duty, fraudulent misrepresentation and equitable fraud, unjust enrichment, and goods sold and delivered.  Presently before the Court are cross-motions filed by NASCO and Ostermueller.  Ostermueller moved for summary judgment on the issue of his individual liability for Watson's obligations to NASCO.  NASCO moved for partial summary judgment, including (1) a determination of the amount of damages owed to it by Defendants, and (2) a determination that Ostermueller is jointly and severally liable for Watson's debt to NASCO.  For the reasons stated below, the Court will grant Ostermueller's motion because it finds that the record does not support any of NASCO's theories of individual liability against him.  Accordingly, NASCO's motion for summary judgment on the issue of Ostermueller's liability must be denied.  The Court will also deny the portion of NASCO's motion for summary judgment that seeks a partial adjudication of damages because Watson was able to raise a genuine dispute as to the amount of damages.

## I.  BACKGROUND

NASCO, a corporation which is organized under Louisiana law and also maintains its principal place of business in that state, is a steel importing company.  Kumar Banerjee is NASCO's Chief Executive Officer and owner.

Watson was founded by the late George Watson in 1946 as a wire warehouse and distributor.  Rudolph Ostermueller was hired as a salesman in 1949 and purchased the company from Watson's estate after the founder's death.  He moved the company from New York to New Jersey and registered it as a New Jersey corporation.  William Rigney was hired by Watson in

1964 as a salesman.  Rigney eventually became Vice President and fifty percent owner of

Watson.  Gary Ostermueller, the individually named defendant in this action, joined the company

in 1980 as a salesman.  In 1992 when his father retired, Gary Ostermueller assumed the position

of Vice President and fifty percent owner; Rigley became President.  In 2002 Rigney retired and

his daughter Kerin Sidlowski, who had joined the company in 1990, became Executive Vice

President and took ownership of one-third of the stock.  From 2002 to 2009, Ostermueller was

the President and majority (two-thirds) owner of Watson.  (Ostermueller Cert. ¶¶1-6;

Ostermueller Dep. 61:9-10, April 12, 2010.)

During the summer of 2002, William Rigney met with Bishu Garodia of Mangal Steel

Enterprises ("Mangal"), a steel manufacturing company in India.  In 2003, Watson began

importing Mangal steel through NASCO.  In 2005, Watson began to have financial troubles.

(Ostermueller Dep. 79:23.)  Ostermueller and David Jones, Watson's Vice President of

Operations, visited Bishu and Adarsh Garodia in Kolkata, India to discuss the option of Watson

importing more products from Mangal through NASCO; they also asked Mangal to invest in

Watson and the parties agreed that financial issues would be discussed at a later point.  In late

2006, based on financial difficulties, Watson decided to shut down a manufacturing plant it had

in Petersburg, Virginia.  (Id. 104-22-25.)

In early 2007, Watson participated in a trade show in Las Vegas, Nevada.  It invited

Adarsh Garodia of Mangal and Gary Gemes and John Henly of Eastgate Global Logistics

("Eastgate").  In August 2007, NASCO, Watson and Eastgate formed a joint venture called

Worldwide Construction Products ("WCP" or "joint venture"), whereby steel would be

purchased from Mangal and imported by NASCO; Watson would provide accounting for the

entire operation and manage and market materials stored in its warehouses in Kenilworth, New

Jersey and York, Pennsylvania; Eastgate would manage and market materials stored in Charlotte, North Carolina.  (Kumar Banerjee Dep. 96:11-103:18, Apr. 7, 2010.)  The joint venture began operating in the summer of 2007.  No signed agreement existed memorializing the terms of the joint venture at that point.  The relationship developed through emails and verbal communications but was not stated in a formal contract.  (Id. 104:2-3.)  The venture was organized as a limited liability company ("LLC") under Delaware law on August 3, 2007.  (Banerjee Cert. App. H.)  Since Watson provided a corporate attorney to do the legal work, Ostermueller "was set up as the manager [of the LLC]."  (Ostermueller Dep. 73:25-74:7.)  It was understood between the parties that there were three joint venture "members"—Watson, Eastgate, and NASCO.  During 2007, Watson handled the accounting, computer system, inventory control, and receivable control for the joint venture.  (Banerjee Cert. App. H; Banerjee Dep. 107:12-14.)

Watson managed the money for the joint venture in a "lockbox" account, which is a designated account for a bank line of credit.  As manager for the joint venture, Watson oversaw this account.  While Watson was managing the accounts in 2007, Watson's controller, first Vince Goreyab and subsequently Richard DeSalvo, performed accounting for WCP's receivables, inventory and cash.  (Banerjee Dep. 108:13-14.)

Watson additionally continued to operate on its own, apart from the joint venture.  (Ostermueller Dep. 83:15.)  The inventory for Watson was segregated from joint venture inventory.  (Id. 84:13.)  Watson also maintained two separate lockbox, or designated accounts, both with Sovereign Bank in 2007, one for Watson and one for WCP.  (Id. 121:12-15.)  The WCP lockbox was set up during Goreyab's tenure as controller, so he would have been the one to actually set it up.  It was probably created in May or June 2007.  (Id. 121:14-18.)

Almost immediately after the joint venture began, issues arose between the parties. NASCO complained about discrepancies in the amount and timing of payments from Watson for products sold through the joint venture.  On June 28, 2007, Adarsh Garodia (Mangal), Gary Ostermueller and David Jones (Watson), and Gary Gemes and John Henly (Eastgate) met at the Charlotte warehouse.  (Gallagher Cert. App. D.)  The parties agreed to payment timing and terms and decided that Gary Gemes would take over "day-to-day operational duties" on behalf of the joint venture.  (Id.)

In September 2007, Kumar Banerjee (NASCO) and David Jones and Ostermueller (Watson) met at Watson's warehouse in York.  (Banerjee Dep. 75:14-76:9.)  They discussed "the money situation because it was connected with the line of credit."  (Banerjee Dep. 16:6-9.)  Watson sought permission from NASCO to use WCP inventory—consigned to Watson by NASCO—to open a new asset-based lending line of credit with its bank.

There is a dispute as to whether, from summer 2007 to fall 2007, Watson used WCP receivables as collateral for its Watson line of credit from Sovereign Bank.  NASCO's Local Rule 56.1 Statement of Material Fact #15 asserts that Watson did; Watson's response to NASCO's #15 simply states, "[d]enied."

A memorandum dated October 19, 2007 from Ostermueller to Banerjee states:

> This letter is to serve as notice that the material received in any warehouse locations from North American Steel Connection (NASCO) for the purpose of sale by Watson Metal Products (WMM) and / or Worldwide Construction Products (WCP) is on consignment.  This material is titled to NASCO until the time it is sold.  As such, WMM [Watson] cannot use this material as collateral.

(Banerjee Cert. App. D.)

Another memorandum that appears to have been written in late December[1] states, in

relevant part:

> Just to recap, Sovereign Bank has stopped us from borrowing
> against the receivables of Worldwide until it receives these
> documents signed by you.  What they mean is that all the partners
> in Worldwide acknowledge that we are borrowing cash against the
> receivables and that cash is coming from Sovereign.  Unfortunately
> it has taken the attorney's [sic] several weeks to sort this out.

(Banerjee Cert. App. G.)

Banerjee stated during his deposition,

> [A] line of credit was given to Watson for WorldWide
> Construction Products sales.  All money that was collected on
> behalf of the joint venture went into the designated account to pay
> down the line of credit; all expenses incurred on behalf of WCP
> were paid from that account.

(Banerjee Dep. 112:16-113:9.)

Ostermueller asserts that when the joint venture first began, Watson drew on its Watson

line of credit for both Watson and WCP expenses.  (Ostermueller Dep. 117:23-118:1.)

Ostermueller claims that "Sovereign was made aware of the joint venture with Worldwide prior

to [Watson] going into it."  (Id. 120:1-3.)  However, in the fall of 2007, Sovereign came to

Watson and "stated that they needed to get more information on [] Worldwide and needed to get

an agreement from the other parties [to set up] an asset based lending relationship with

Sovereign Bank and the parties at Worldwide."  (Id. 120:9-16.)  By December 2007

Ostermueller had "worked out with Sovereign a way for Sovereign to loan [WCP] the money,

again on inventory and receivables [but] the inventory at that point was switching to a consigned

inventory so even if they just held it on the receivables of Worldwide and differentiated from

Watson, that would create money as a loan which Mangal refused to sign."  (Id. 120:21-121:6.)

---

[1] The message wishes its recipients a "Merry Christmas" and informs them that Ostermueller
would be out of the office on Wednesday, December 26th.

In an email from Ostermueller to Bishu Garodia dated August 24, 2007, Ostermueller explained, in relevant part,

> Yes I have a bank issue to work out however that is not stopping this.  Also, it must be noted that our cash flow has been funded by [Watson]'s bank.  We are an asset based borrower, we get cash before it is collected which we have used to pay the montly bills including rent and salaries [for WCP].

(Banerjee Cert. App. C.)

In October, 2007, Ostermueller and his partner Sidlowski fired Goreyab because Ostermueller "felt like he was over his head and I needed to replace him and get somebody that I felt was more experienced…a better controller."  (Ostermueller Dep. 107:1-8.)  Richard DeSalvo was hired to replace Goreyab.  An email from Ostermueller to Bishu Garodia (of Mangal) dated November 16, 2007 states, in relevant part:

> My controller, Rich, is very close to having the financials prepared.  We are to meet again later today to review more information.  He has been working on this daily since I hired him, cleaning up the mess the former guy left behind, and making sure everything is correct and makes sense.  It has been a real challenge.  Also, I have provided David with several pieces of information that will assist him in creating the financials that he has been working on with Kumar.  Bishu, I know this has taken longer than any of us wanted, however when it is finished it will be correct.  []
>
> The final piece I have for you today is that we are going through the closing procedures for the Petersburg building today.  Funds will be available early next week.  As you may know, we are shopping for a new bank for Watson Metal.  The current bank has placed a restriction on the proceeds from the building sale and I am not allowed to disburse funds until we leave them.  As a result, to honor my promise to you, I am in the process of taking a personal loan to pay NASCO the $100,000.00.  Those funds will be sent prior to the end of November against the [Watson] payable.

(Banerjee Cert. App. E.)

Shortly after he sent that email, Ostermueller took out a home equity loan and used the money to make a personal loan to Watson of $100,000, so that Watson could pay NASCO $100,000.  He did so "to try to make this venture work."  (Ostermueller Dep. 147:11-148:12.)

On December 18, 2007, the parties met and entered into a proposed agreement to transfer all invoicing and accounting responsibilities from Watson to Eastgate, effective January 1, 2008.  They also agreed to meet in early 2008 to arrive at a final accounting for the joint venture.  (Gallagher Cert. App. E.)  Accordingly, on January 1, 2008, Ostermueller signed—as "Gary E. Ostermueller, President (Watson Metal Products Corporation)"—a document titled "Resignation of Watson Metal Products Corporation as Managing Member of Worldwide Construction Products, LLC."  (Banerjee Cert. App. I.)  The text of the document stated:

> I, Gary E. Ostermueller, President of Watson Metal Products Corporation ("Watson"), hereby, on behalf of Watson, resign as the managing member of WorldWide Construction Products, LLC, a limited liability company formed in the State of Delaware.  This resignation is effective immediately.  Any entity or person dealing with WorldWide Construction Products, LLC, should contact the other members of record of the LLC for any management or decision issues.

(Id.)

Starting on January 1, 2008 and continuing into 2010, Eastgate (through Gary Gemes) took control of the daily activities of the joint venture, including the computer system, bank account, inventory control, and receivable control.  (Banerjee Dep. 108:23-111:14.)  After the change, some customers continued to send their checks to Watson.  (Id. 113:24-114:3.)

An email from Ostermueller to Banerjee sent on January 21, 2008, stated:

> My attorney informed on the following options to transfer or dissolve WCP as a Delaware Corporation.

1.      I can resign as manager and the LLC will be forced to dissolve.  You would then be required to start all over again by filing your own paperwork to create a new company.

2.      We can prepare an agreement between Watson (me) and NASCO where you release Watson from the corporation including any and all liability under and via Worldwide.  If you agree to this, the transfer can take place and you will continue to operate as WCP.  My attorney will prepare this agreement if you concur.  The corporation can be transferred to another state if you want.  We chose Delaware because of the no corporate tax policy.

This separation agreement would not change any of the liabilities Watson has toward Worldwide (or the opposite) regarding the financial obligations of the past nor effect our rep agreement going forward.

(Banerjee Cert. App. J.)

At some point, Watson discovered that during approximately July and August 2007, Watson's controller at the time, Vince Goreyab, took money that should have gone to the WCP lockbox and put it into Watson, "instead of keeping [the funds] separate as he was instructed to do." (Ostermueller Dep. 45:22-46:6.)  In October, 2007, Ostermueller and his partner Sidlowski had fired Goreyab because Ostermueller "felt like he was over his head and I needed to replace him and get somebody that I felt was more experienced…a better controller." (Ostermueller Dep. 107:1-8.)

Banerjee found out about the intermingling just before February when NASCO "got some figures from Rich which didn't add up." (Banerjee Dep. 124:15-16.)  Ostermueller and the controller confirmed that based on the data, there was "apparent intermingling." (Banerjee Dep. 148:11-13.)  During the February meeting, the parties agreed that the intermingling left Watson indebted to NASCO in the amount of $331,000.  There is no evidence that Ostermueller or anyone else at Watson personally benefitted from the diversion of funds. (Banerjee Dep. 254:16-21.)

On February 13-14, 2008, the parties met to sort out the accounting problems.  David Jones, Gary Ostermueller and Rich Desalvo of Watson, and Kumar Banerjee of NASCO attended.  (Id. 140:21-22.)  They produced an agreement ("February Agreement") that stated, in relevant part:

1. The balance due to NASCO as of December 31, 2007 for supply of material sold by WCP during 2007 is $882,740 based on figures presented.  However, this figure is subject to change as there is an apparent discrepancy of about $200k between theoretical inventory ($1099k) and physical inventory ($870k), which will have to be reconciled before a final determination can be made.

2. Of the balance owed to NASCO (TBD), Watson Metal Products is responsible for payment to NASCO of $331,362.  Due to the systems in place during 2007, there was an apparent intermingling of funds between the two companies WCP and Watson Metal Products, and the figure $331,362 has been determined to be the amount of WCP funds that were utilized by Watson Metal Products.

3. The total amount payable by Watson Metal Products to NASCO as of December 31, 2007 is the sum of $331,362 owed on WCP account (per item 2 above), and the $165,498 balance owed on WMM account, giving a grand total of $496,860.

4. Watson Metal Products will pay its debt of $496,860 to NASCO (per item 3 above) as expediently as cash-flow permits, and will remit to NASCO a sum of no less than $50,000 per month starting March 2008.  Additionally, all rep-commission @ 10% earned by Watson Metal Products from WCP operations going forwards will continue to be netted off the balance until the debt is liquidated.

5. Interest at 1.2% per month on unpaid balances will be billed to Watson Metal Products by NASCO on a monthly basis starting March, 2008.

6. Money received at Kenilworth on account of collections of WCP year-end 2007 receivables, with a check for $50,906.13 being remitted to Charlotte immediately.

Going forward, all money's received at Kenilworth on WCP accounts will be remitted to Charlotte promptly.

7.     The Watson Metal Products "in kind" contribution towards start-up costs of WCP has been determined to be $27,120 as against the figure of $82,940 currently being shown in the books.  Correcting journal entries will be passed accordingly.

(Banerjee Cert. App. K.)

The February Agreement was signed by Ostermueller as CEO and Controller of Watson Metal Products and Kumar Banerjee as CEO of NASCO.  DeSalvo also signed as a witness and the Controller of Watson Metal Products.  (Id.)  NASCO did not seek a personal guarantee from Ostermueller.  (Banerjee Dep. 152:20-22.)

Banerjee acknowledged that it did not appear that Ostermueller had personally performed the accounting that caused the intermingling; but he asserts that "the buck stops" with the CEO, so "it's up to [Ostermueller] to make sure that Rich DeSalvo keeps proper track of the money." (Id. 158:9-21.)  NASCO "trusted" Ostermueller and Banerjee "figured [the February Agreement] would be enough…to [get them] paid."  (Id. 152:18-23.)

An LLC agreement for "Worldwide Constructive Products, LLC," signed by Ostermueller (on behalf of Watson), Banerjee (on behalf of NASCO) and Gary Gemes (on behalf of Eastgate) on February 13, 2008 states:

2.     The founding members consist of Watson Metal Products Corporation ("Watson"), North American Steel Connection ("NASCO") and Eastgate Global Logistics ("Eastgate").
3.     It has been agreed by and between the Members that, effective January 1, 2008, that Watson and Eastgate withdraw as Members of Worldwide, resulting in North American Steel Connection (NASCO) being the sole remaining Members [sic].
4.     Effective January 1, 2008, Gary E. Ostermueller, President of Watson, on behalf of Watson, resigns as the Managing

> Member of Worldwide and Watson withdraws as a Member of
> Worldwide.
>    5.    Effective January 1, 2008, Eastgate, by and through
> its principals, Gary Gemes, withdraws as a Member of Worldwide.
>    […]
>    6.    NASCO, as the sole remaining Member, through its
> agent, Kumar Banerjee, will be the Managing Member.

(Banerjee Cert. App. H.)

According to the February agreement, Watson was responsible to NASCO for $331,362

based on the intermingling of joint venture funds in 2007.  Additionally, $165,498 was payable

by Watson to NASCO based on debts incurred prior to the joint venture.  The sum of $331,362

and $165,498 is $496,860.  The agreement also provides for 1.2% interest on unpaid balances

beginning in March 2008 and the offsetting of "rep-commissions" against the debt.  Watson

made one payment of $50,000 in March 2008.

NASCO contends that Watson therefore owes $496,860 minus $50,000 (for the March

2008 payment), which is $446,860.  NASCO contends that Watson also owes 1.2% interest per

month on the balance; and that 25 months of interest amounts to $169,799.  Thus, NASCO

asserts that Watson owes a total of $616,659.  NASCO claims that this sum is undisputed and

stipulated to in the February agreement.

Watson disputes that the February Agreement provides the "undisputed and stipulated"

figure comprising its debt to NASCO.  Banerjee acknowledged during his deposition that

Watson should have received a credit of $98,513 for sales commissions after the February

Agreement.  (Banerjee Dep. 49:6-50:11.)  Ostermueller approximated during his deposition that

Watson should have received $108,000 in commissions.  (Ostermueller Dep. 56:20-21.)

Additionally, Ostermueller asserted during his deposition that $118,000 worth of inventory that

Watson owned was sold by NASCO.  (Ostermueller Dep. 54:20-22.)  Watson discovered that

discrepancy after the February Agreement, in April 2008.  (Ostermueller Dep. 55:11-17.)

Ostermueller does not remember whether he informed NASCO about the $118,000 when he

discovered it.  (Id. 55:21.)

After resigning as a member of the joint venture on January 1, 2008, Watson continued to

be involved with the venture only in its capacity as a warehouse agent.  In July 2008, NASCO

terminated that agreement.  A letter from Ostermueller to Bishu and Adarsh Garodia dated July

21, 2008, stated, in relevant part:

> Watson Metal reached out to Mangal in 2007 because we needed
> help in competing in a low price market at a time when you were
> looking for distribution in the United States.  This was during the
> beginning of our financial difficulties; after all we would not have
> been closing Virginia if we were doing well….Watson made
> mistakes with the finances, people were fired for not performing as
> instructed in this regard and we have been crawling out of this
> mess ever since.
> […]
> Accounting errors were made, and once we were made aware a
> repayment plan was put into place as quickly as possible.  These
> errors were due to human error and the time delay in discovering
> them made the task more difficult.  Unfortunately, our cash
> position is very tight so we do not have the ability to write a check
> immediately when an error is discovered.

(Banerjee Cert. App. N.)

The original Complaint was filed the next month, on August 22, 2008.  While this action

was pending, on May 9, 2009, Watson sold all of its assets (including machinery, plant,

equipment, inventory and accounts receivable) to a Colorado company, Acme Manufacturing

Company.  (Ostermueller Dep. 9:13-15, 11:21, 12:1-2.)  The majority of the assets were paid

directly to the bank that was the secured lender, Greenfield Commercial Credit.  (Id. 13:3-6.)

Acme created a new company, WMPC, Incorporated, to purchase the assets from Watson.

WMPC, Inc. ("WMPC") is still located in Kenilworth, New Jersey.  (Id. 8:6-12.)  WMPC

employed Ostermueller for a period after the sale.  (Id.  8:4-6.)  The legal entity (formerly Watson) that had just sold all its assets to Acme "had to legally change its name, so we go by GOST [], Incorporated, because Acme may have bought the name as part of its asset sale.  So GOST held onto some inventory that Acme did not want to purchase."  Ostermueller sold that extra inventory over time and Acme reimbursed him for the material.  (Id. 28:23-29:12.)

The Amended Complaint, filed in this Court on June 1, 2009, asserts five claims for relief against the Defendants:  (1) breach of contract, for breach of the agreement reflected in the Minutes of Meeting Held on February 13/14, 2008 ("February Minutes"); (2) breach of fiduciary duty; (3) fraudulent misrepresentation and equitable fraud; (4) unjust enrichment; (5) goods sold and delivered.  The Amended Complaint seeks $646,339.15 (or an amount to be proved at trial) in damages; punitive damages; interest, costs, and attorneys' fees.  Jurisdiction is premised on diversity of citizenship.

## II.  DISCUSSION

NASCO filed a motion for partial summary judgment on June 25, 2010, seeking (1) summary judgment based on the February Agreement against Watson in the amount of $159,385 and against Watson and Ostermueller, jointly and severally, in the amount of $457,274; and (2) summary judgment imposing individual liability on Ostermueller based on Watson's breach of the fiduciary duty it owed to NASCO as a joint-venturer.  Ostermueller filed a motion for summary judgment on June 28, 2010 seeking dismissal of all the claims against him because there is no support in the record for NASCO to impose individual liability on him.

### A.    Standard of Review

Summary judgment is proper where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  For

an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party."  Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006).  For a fact to be material, it must have the ability to "affect the outcome of the suit under governing law."  Id.  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.

In a motion for summary judgment, the moving party has the burden of showing that no genuine issue of material fact exists.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  When the moving party does not bear the burden of proof at trial, the moving party may discharge its burden by showing that there is an absence of evidence to support the non-moving party's case. Id. at 325.  If the moving party can make such a showing, then the burden shifts to the non-moving party to present evidence that a genuine issue of fact exists and a trial is necessary. Id. at 324.  In meeting its burden, the non-moving party must offer specific facts that establish a genuine issue of material fact, not just create "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

In deciding whether an issue of material fact exists, the Court must consider all facts and their reasonable inferences in the light most favorable to the non-moving party.  See Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).  The Court's function, however, is not to weigh the evidence and determine the truth of the matter, but, rather, to determine whether there is a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  If there are no issues that require a trial, then judgment as a matter of law is appropriate.

**B.      Defendant Ostermueller's Motion for Summary Judgment**

Ostermueller moves for summary judgment, asserting that there is no evidence to support any theory of liability on his part for Watson's debts.  Specifically, Ostermueller argues

15

that NASCO has failed to adduce evidence in support of a breach of contract claim or a veil-piercing, equitable fraud, or participation theory.  Moreover, the equitable fraud theory cannot be used to reach an officer of a corporation unless NASCO can also succeed on a veil-piercing theory.  NASCO counters that equitable fraud does allow a plaintiff to reach a corporation's officer, and asserts that the record contains facts that support a finding that Ostermueller is individually liable to it.  When the moving party does not bear the burden of proof at trial, the moving party may discharge its burden on a summary judgment motion by showing that there is an absence of evidence to support the non-moving party's case.  <u>Celotex</u>, 477 U.S. at 325.

Before addressing the merits of Ostermueller's motion, the Court will begin by addressing a preliminary issue.  NASCO asserts that Ostermueller's motion for summary judgment should be dismissed on procedural grounds because it was filed without the statement of material facts required by Local Civil Rule 56.1.  A review of the electronic docket reveals a letter dated July 20, 2010 from Peter J. Gallagher, the attorney for Ostermueller, which states that although Gallagher mistakenly omitted the Rule 56.1 statement in his electronic filing, he did serve a paper copy on NASCO's attorney when the motion was filed.  A copy of the Rule 56.1 statement was attached to Gallagher's July 20th letter.  (Dkt. # 53.)  On July 21, 2010, NASCO's attorney replied and conceded that the paper copy of the motion served on it had included a copy of the Rule 56.1 statement.  NASCO thereafter submitted a response to Ostermueller's Rule 56.1 statement.  As there is no evidence that NASCO will be unduly prejudiced by Ostermueller's failure to file the statement with the electronic version of his motion, the Court will reject NASCO's argument that the motion to dismiss should be denied on procedural grounds.

  i.  *Piercing the Corporate Veil*

  Ostermueller asserts that NASCO has not adduced evidence that would support a theory that Watson's corporate veil should be pierced to subject Ostermueller to individual liability for Watson's obligations to NASCO.

  In State, Department of Environmental Protection v. Ventron Corp., 94 N.J. 473, 500 (1983), the Supreme Court of New Jersey explained that the "purpose of the doctrine of piercing the corporate veil is to prevent an independent corporation from being used to defeat the ends of justice, to perpetrate fraud, to accomplish a crime, or otherwise to evade the law."[2] Shotmeyer v. New Jersey Realty Title Ins. Co., 195 N.J. 72, 86 (2008).  The veil-piercing inquiry "begin[s] with the fundamental propositions that a corporation is a separate entity from its shareholders, Lyon v. Barrett, 89 N.J. 294, 300 (1982), and that a primary reason for incorporation is the insulation of shareholders from the liabilities of the corporate enterprise." State, Dep't of Env't Prot. v. Ventron Corp., 94 N.J. 473, 500 (1983).  As such, "piercing the corporate veil is not technically a mechanism for imposing legal liability, but for remedying the fundamental unfairness that will result from a failure to disregard the corporate form." Verni ex rel. Burstein v. Stevens, 387 N.J. Super. 160, 199 (App. Div. 2006) (quotations omitted), certif. denied, 189 N.J. 429 (2007).  In the absence of fraud or injustice, courts will not pierce the corporate veil to impose liability on a corporation's owners and officers.  See, e.g., Ventron, 94 N.J. at 500 (citations omitted); Dep't of Env't Prot. v. Arky's Auto., 224 N.J. Super. 200, 207 (App. Div. 1988); Touch of Class Leasing v. Mercedes-Benz Credit, 248 N.J. Super. 426, 441 (App.Div. 1991).

  A party seeking to pierce the corporate veil bears the burden of establishing that the corporate form should be disregarded.  Richard A. Pulaski Constr. Co. v. Air Frame Hangars,

---

[2] The parties have not disputed that New Jersey law applies to this matter.

Inc., 195 N.J. 457, 472 (2008).  "The issue of piercing the corporate veil is submitted to the

factfinder, unless there is no evidence sufficient to justify disregard of the corporate form."

Verni, 387 N.J Super. at 199 (citations omitted).

Although piercing the corporate veil often arises in the context of a parent-subsidiary

relationship, New Jersey courts have also pierced the corporate veil of a closely held corporation

to impose liability on individual owners or shareholders.  See, e.g., Conestoga Title Ins. Co. v.

Premier Title Agency, Inc., 328 N.J. Super. 460, 465, aff'd, 166 N.J. 2 (2000); Stochastic

Decisions, Inc. v. DiDomenico, 236 N.J. Super. 388, 395 (App. Div. 1989); In re Buildings by

Jamie, Inc., 230 B.R. 36, 42 (Bankr. D.N.J. 1998); Kugler v. Koscot Interplanetary, Inc., 120

N.J.Super. 216 (Ch. Div.1972).

In the parent-subsidiary context, the plaintiff must show that (1) the parent so dominated

the subsidiary that it had no separate existence but was merely a conduit for the parent and (2)

the parent has abused the privilege of incorporation by using the subsidiary to perpetrate a fraud

or injustice, or otherwise to circumvent the law.  Craig v. Lake Asbestos of Quebec, Ltd., 843

F.2d 145, 149 (3d Cir. 1988).  The factors that have been cited to guide courts in the parent-

subsidiary context in deciding whether to pierce the corporate veil include:

> [G]ross undercapitalization . . . failure to observe corporate
> formalities, non-payment of dividends, the insolvency of the debtor
> corporation at the time, siphoning of funds of the corporation by
> the dominant stockholder, non-functioning of other officers and
> directors, absence of corporate records, and the fact that the
> corporation is merely a facade for the operations of the dominant
> stockholder or stockholders.

Bd of Trs. v. Foodtown, Inc., 296 F.3d 164, 172 (3d Cir. 2002) (quoting Craig, 843 F.2d at 150).

Similarly, to pierce the corporate veil in the shareholder or officer context, the plaintiff

must show that (1) the corporation is organized and operated as a mere instrumentality, or alter

ego, of a shareholder, (2) the shareholder uses the corporation to commit fraud, injustice or circumvent the law, and (3) the shareholder fails to maintain the corporate identity.  Foodtown, 296 F.3d at 171-72.

In both contexts, it is clear that there are two basic prongs to the veil-piercing analysis: (1) domination of the corporation and abuse of the corporate form; and (2) use of the corporate form to perpetrate fraud or injustice.  The various factors change based on the particular factual landscape.

The question before the Court is whether there is any evidence in the record to support a finding that Ostermueller so dominated Watson and abused its corporate form that Watson's corporate veil should be pierced to establish his individual liability.  NASCO asserts that (1) Ostermueller attempted to pledge joint venture inventory as collateral for a Watson line of credit; (2) Ostermueller attempted to secure a personal loan to ostensibly pay Watson's debt to NASCO; and (3) Ostermueller used personal pronouns when referring to the joint venture (in an email to Banerjee in January 2008, Ostermueller said "I can resign as manager and the LLC will be forced to resolve….[or] [w]e can prepare an agreement between Watson (me) and NASCO"). NASCO next asserts that "Defendants" abused the corporate form by intermingling joint venture funds, using joint venture funds to satisfy Watson's individual liabilities, and by Ostermueller making a personal loan to Watson for the purpose of paying Watson's debt to NASCO.  (Pl.'s Br. Opp'n Mot. Summ. J. 13.)

NASCO has not adduced evidence that would be sufficient to establish a veil-piercing theory to reach Ostermueller through Watson.  There is no evidence that Ostermueller failed to maintain Watson's separate corporate identity or that Watson was operated as a mere instrumentality in Ostermueller's control.  When Ostermueller attempted to pledge joint venture

inventory as collateral, he was acting on behalf of Watson, which was having cash-flow problems and needed an extra source of cash to support its part of the joint venture. There is no evidence that Ostermueller abused Watson's corporate form by seeking the permission of Watson's co-venturers to borrow against the joint venture's assets to finance Watson's expenses. Moreover, there is evidence that the co-venturers refused permission and Watson did not secure a line of credit using WCP's inventory.

There is no evidence that when Ostermueller secured a personal home equity loan, he was disregarding the corporate form. Rather, he sought and obtained a personal loan; with that money, he loaned a sum to Watson so that Watson could pay NASCO. There is no evidence that the Ostermueller took out the loan to benefit himself personally; nor is there evidence that he was siphoning funds from Watson for personal use. NASCO's assertion that Ostermueller was trying to take out a personal loan using WCP assets as collateral finds no support in the record. Furthermore, taking out a personal loan in order to make a loan to a closely held corporation does not constitute failure to observe the corporate form.

Next, NASCO argues that Watson used the personal pronouns "me" and "I" when discussing in a January 2008 email to Banerjee the joint venture's legal options for changing the joint venture's LLC structure to deliver power to NASCO. Evidence that Ostermueller referred to himself as an agent of Watson in the personal form is not enough to show that he was using Watson as his alter ego. Furthermore, this Court explained in a recent decision that closely held corporations must necessarily be "dominated" by the sole or few shareholders that comprise it because the business must function and be profitable; the business cannot act but through its agents. See State Capital Title & Abstract Co. v. Pappas Business Services, LLC, 646 F. Supp. 2d 668, 679 (D.N.J. 2009). As the President of Watson, it is only natural that Ostermueller

would see himself as an agent of the corporation.  Domination alone is not sufficient to justify

the extraordinary remedy of veil-piercing.  If it were, "the members of [any] small, closely held

corporation would be subject to individual liability in any instance" when the corporation is

alleged to be liable.  See id.  The Defendants have not adduced any evidence to support the first-

prong of the veil piercing theory.  It does not appear that Ostermueller used Watson as its alter

ego or abused the corporate form.

  Next, NASCO suggests that Ostermueller used the corporate form to perpetrate fraud or

injustice by intermingling joint venture funds and using joint venture funds to satisfy Watson's

individual liabilities.  However, there is no evidence that Ostermueller was personally

responsible for the intermingling.  Rather, the uncontroverted evidence establishes that Watson's

controller Goreyab made accounting mistakes that caused the intermingling.  When NASCO

confronted Ostermueller with evidence of those mistakes in February 2008, Ostermueller and his

employees (Jones and the new controller, DeSalvo) agreed that there was an apparent

discrepancy and attempted to rectify it in the February Agreement.  Therefore, although the

consequence of the intermingling was that Watson used WCP funds, there is no evidence that

Ostermueller attempted to use the corporate form in a fraudulent manner to do so.  Rather, as

NASCO admits in its brief, the intermingling resulted from "financial mistakes and errors that

have injured the joint venture."  There is no evidence that the wrong here—intermingling of joint

venture funds—was perpetrated by fraud or illegal conduct.  NASCO has not presented any

evidence that could lead a reasonable jury to conclude that the intermingling was the result of

anything but a mistake.  NASCO's theory would allow any creditor to sue any shareholder or

officer anytime a corporation's employees made a mistake or a corporation was unable to satisfy

its debt.  NASCO has not shown that Ostermueller used Watson's corporate form to perpetrate fraud, injustice, or some other illegality.

    *ii.    Equitable Fraud*

NASCO asserts without citation to any source that "this Court and the Courts of New Jersey have found that corporate officers may be liable for their corporations [sic] actions under the theory of equitable fraud, which requires neither intent nor scienter."  (Pl.'s Br. Opp'n Mot. Summ. J. 7.)

Legal fraud requires a demonstration of five elements:  (1) a material representation by the defendant of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intent that the plaintiff rely upon it; (4) reasonable reliance by the plaintiff; and (5) resulting damage to the plaintiff.  Weil v. Express Container Corp., 360 N.J. Super. 599, 612-13 (App. Div. 2003).  Equitable fraud is similar but does not require knowledge of the falsity and an intent to obtain an undue advantage.  Id.  Only equitable remedies are available under the doctrine of equitable fraud.  See Jewish Center of Sussex County v. Whale, 86 N.J. 619, 625 (1981).

NASCO argues that equitable fraud alone is sufficient to justify disregarding the corporate form to reach a corporation's officer.  Ostermueller counters that NASCO's only support for this proposition is a quote taken out of context; and NASCO has not cited any case in which a New Jersey court pierced the corporate veil based on equitable fraud alone.  The Court agrees.

In Walensky v. Jonathan Royce Int'l, Inc., 264 N.J. Super. 276, 283(App. Div. 1993), the Appellate Division wrote, "in a court of equity, all that is required to justify the piercing of a corporate veil is 'equitable fraud.'"  A reading of that passage in context, however, reveals that

the court meant to assert that equitable fraud, as opposed to legal fraud, is sufficient to support the second prong of a veil piercing analysis where equitable relief is sought.  The court in Walensky had already determined that the individual defendant was using the corporate form as his alter ego.  In analyzing the equitable fraud aspect of the veil-piercing analysis, the court never divorced the fraud inquiry from the alter ego inquiry.  Id.  The Court finds no support for NASCO's assertion that it may rely theory of equitable fraud alone to reach Ostermueller in his individual capacity.

  *iii.*  *Joint Venture Liability*

  NASCO asserts, again without citation to a specific legal authority, that "[b]ased on the heightened fiduciary relationship between members of a joint venture, the officers of the corporations acting as co-venturers may be held individually liable for the acts of their corporate member in breach of its duty of finest loyalty to the other members."  (Pl.'s Br. Opp'n Mot. Summ. J. 10.)

  The parties do not dispute that Watson, NASCO, and Eastgate were members of a joint venture. The relationship of joint venturers, like that of partners, is "one of trust and confidence," requiring the highest standard of good faith; one joint venturer may not take advantage of the other.  Muscarelle v. Castano, 302 N.J. Super. 276, 283 (App. Div. 1997); Silverstein v. Last, 156 N.J. Super. 145, 152 (App. Div. 1978).

  As the present motion for summary judgment is limited to the issue of whether Ostermueller is liable for the money allegedly owed to NASCO by Watson, the issue of whether Watson breached a duty to NASCO is not before the Court and therefore the Court need not decide it.  Assuming for the purpose of this motion that Watson breached a duty it owed to NASCO as a joint-venturer, NASCO has not presented a reason why the President of one of the

joint venture's members should be held liable based on that breach alone.  As the Court previously discussed, there is no basis for veil-piercing in this case.  NASCO cannot use the joint venture theory as an end-run around the burdens imposed on a party seeking to disregard the corporate form.  NASCO cannot hold Ostermueller individually liable based solely on Watson's membership in the joint venture.

NASCO has asserted that Ostermueller was the "manager" of the joint venture, assuming an individual role in the joint venture's operation.  In support of its assertion, NASCO points to Ostermueller's deposition testimony.  When asked about the statement "I can resign as manager" that Ostermueller made to Banerjee in an email, Ostermueller said:

> [I was resigning from] WCP in that my attorney told me that I was under, let me say it this way, I was under the impression, right or wrong, that the LLC had to have a manager to it and I was listed being that I was doing all the legal work to set the thing, it was my corporate attorney that I was using, I was set up as the manager.

(Ostermueller Dep. 73:25-74:7.)

The original LLC agreement is not in the record so the Court cannot refer to the legal document to determine in what capacity Ostermueller was "manager."  The LLC agreement that the parties signed in on February 13, 2008 appears to amend the prior LLC agreement.  (Banerjee Cert. App. H.)  Paragraph four of the February 2008 LLC agreement states:

> Effective January 1, 2008, Gary E. Ostermueller, President of Watson, on behalf of Watson, resigns as the Managing Member of Worldwide and Watson withdraws as a Member of Worldwide.

(Id.)

A plain reading of that paragraph shows that Ostermueller's resignation was "on behalf of Watson," not personal.  The Court has no evidence that Ostermueller's role in the joint venture was personal rather than as an agent of Watson.  Without more, Ostermueller's lay

testimony that he was named as a "manager" on LLC paperwork is not enough to find that he owed a duty to the joint venture, separate and apart from his role as an agent of Watson. There is no basis to assert that Ostermueller was a member of the joint venture. As an agent of Watson within the joint venture, NASCO could only assert individual liability against Ostermueller through a veil piercing theory, and the Court has already determined that the veil-piercing remedy is not warranted here.

> iv.    *Participation Theory*

The "essence" of the participation theory is "that a corporate officer can be held personally liable for a tort committed by the corporation when he or she is sufficiently involved in the commission of the tort." <u>Saltiel v. GSI Consultants</u>, 170 N.J. 297, 303 (2002). "A predicate to liability is a finding that the corporation owed a duty of care to the victim, the duty was delegated to the officer and the officer breached the duty of care by his own conduct." <u>Id.</u> NASCO appears to contend that Ostermueller participated in Watson's commission of two torts: breach of fiduciary duty and equitable fraud.

NASCO asserts that Watson owed a fiduciary duty to NASCO as joint venturers. As the Court previously stated, the relationship of joint venturers, like that of partners, is "one of trust and confidence," requiring the highest standard of good faith; one joint venturer may not take advantage of the other. <u>Muscarelle</u>, 302 N.J. Super. at 283; <u>Silverstein</u>, 156 N.J. Super. at 152. NASCO asserted that Watson breached its duty by intermingling joint venture funds with its separate corporate funds, and paying Watson's separate corporate debts with those funds. However, the undisputed record shows that Ostermueller did not participate in the intermingling of funds; rather, there is no genuine dispute that Watson's controller intermingled the funds by mistake. The paying of corporate debts with WCP funds only occurred in the general course of

business once the funds were intermingled, so Ostermueller was also not involved in that aspect of the alleged breach.

NASCO also asserts that Watson breached its fiduciary duty by attempting to use joint venture assets as collateral. The record shows that Watson was unable to use joint venture assets as collateral; Ostermueller attempted to structure such a relationship on behalf of Watson but was unable to do so because the other joint venturers did not consent. Watson's attempt to structure an asset based lending relationship with the bank for WCP cannot constitute breach of a fiduciary duty because Ostermueller disclosed his attempt to his co-venturers and they declined to accept the arrangement. Watson cannot be said to have taken advantage of the relationship by seeking permission; it sought permission from its co-venturers and when they declined to accept the proposed arrangement, it did not make further attempts to set up the lending agreement. There is no evidence to support a finding that Ostermueller participated in a breach of Watson's duty to NASCO.

      *v.*    *Conclusion*

Having determined that there is no evidence to support NASCO's various legal theories to impose personal liability on Ostermueller, the Court will grant Ostermueller's motion and dismiss Ostermueller as an individual defendant from this matter.

## C.    NASCO's Motion for Summary Judgment

NASCO seeks partial summary judgment (1) as to the amount of damages owed to it based on the February Agreement's "undisputed and stipulated sums," and (2) for a determination that Ostermueller should be individually liable to NASCO. Having granted Ostermueller's motion for summary judgment and determined that Ostermueller should be

dismissed as a party to this suit, the Court will deny NASCO's motion for summary judgment as to Ostermueller's individual liability.

NASCO seeks partial summary judgment on damages.  Specifically, NASCO seeks summary judgment ordering that (1) Watson owes NASCO $159,385 for the debt incurred before the joint venture (the $165,498 described in paragraph three of the February Agreement, minus the $50,000 paid in March 2008, plus $43,887 in interest) and (2) Ostermueller and Watson jointly and severally owe Watson $457,274 allegedly incurred during the joint venture (the $331,362 described in the February Agreement plus $125,912 in interest).  NASCO contends that these figures are "undisputed and stipulated sums."  The Court finds that material issues of fact exists as to the amount of damages.  A reasonable jury could find that Watson may offset the commissions it earned in 2008 against the amount set forth in the February Agreement. The Court will decline to grant summary judgment based on the allegedly "stipulated sums" in the February Agreement.

Watson disputes that the February Agreement provides the "undisputed and stipulated" figure comprising its debt to NASCO.  Banerjee acknowledged during his deposition that Watson should have received a credit of $98,513 for sales commissions after the February Agreement.  (Banerjee Dep. 49:6-50:11.)  That sum was also noted as an offset from the damages computation in NASCO's Federal Rule of Civil Procedure 26 disclosure.  NASCO apparently now disputes that that figure should be deducted from Watson's debt.

Ostermueller approximated during his deposition that Watson should have received $108,000 in commissions (as opposed to Banerjee's $98,513 figure).  (Ostermueller Dep. 56:20-21.)  Additionally, Ostermueller asserted that in 2008, $118,000 worth of inventory that Watson owned was sold by NASCO.  (Ostermueller Dep. 54:20-22.)  Watson discovered that

discrepancy after the February Agreement, in April 2008.  (Ostermueller Dep. 55:11-17.) Ostermueller does not remember whether he informed NASCO about the $118,000 when he discovered it.  (Id. 55:21.)

These issues of fact are material to the court's determination of damages and will preclude summary judgment on the amount of damages.  NASCO has not met its burden of showing that there is no dispute to its entitlement to $616,659 (the sum of $159,385 and $457,274).

### III.  CONCLUSION

For the foregoing reasons, Ostermueller's motion for summary judgment on the issue of his individual liability is granted.  Accordingly, all the claims against Ostermueller are dismissed.  The Court will deny the portion of NASCO's motion that seeks to impose individual liability on Ostermueller.  The Court will also deny the portion of NASCO's motion that seeks a determination that the February Agreement provides an "undisputed and stipulated" amount of damages.

The Court will enter an order implementing this opinion.

<u>   s/ Dickinson R. Debevoise   </u>
DICKINSON R. DEBEVOISE, U.S.S.D.J.


Dated: September 14, 2010